SWIFT & CO. v. RECONSTRUCTION FINANCE CORPORATION.

No. 47 C 973.

District Court, N. D. Illinois, Eastern Division.

May 21, 1948.

Poppenhusen, Johnston, Thompson & Raymond of Chicago, Ill., for plaintiff.

Otto J. Kerner Jr., U. S. Atty., of Chicago, Ill., for defendant.

SULLIVAN, District Judge.

This is a civil action brought by Swift & Company against the Reconstruction Finance Corporation pursuant to Section 2(m) of the Emergency Price Control Act of 1942, as amended and extended, 58 Stat. 632, 636, 50 U.S.C.A.Appendix, § 902(m), seeking a declaratory judgment directing Reconstruction Finance Corporation (hereinafter called RFC) to pay to Swift & Company the sum of $221,861.- 51 which it alleges is a balance due and payable on its claim for livestock slaughter subsidies, in accordance with the authority granted by Section 2(e) of the Emergency Price Control Act.

The complaint alleges that RFC authorized the payment of subsidies to slaughterers, of which Swift & Company is one, and by Regulation No. 10 established the terms and conditions for such payments. That Regulation No. 10 was effective for the period from September 1, 1946, through October 14, 1946; that on October 15, 1946, the Office of Price Administration lifted price ceilings of livestock, meat and other livestock products, effective as of October 15, 1946. That on October 1, 1946, and October 4, 1946, respectively, in conformity with Regulation No. 10 Swift filed its claim for livestock slaughter payments in the amount of $929,679.97 for the accounting period beginning September 1, 1946, and ending September 28, 1946; and that on October 17, 1946, and October 21, 1946, it filed its claims for livestock slaughter payments in the amount of $596,765.05 for the accounting period beginning September 29, 1946, and ending October 14, 1946. That Swift has received from RFC the sum of $1,304,583.51 in partial payment of

said claims, and that there remains due and payable to Swift & Company from RFC an unpaid balance of $221,861.51 upon said claims, which RFC has refused to pay. That on March 31, 1947, RFC issued its Announcement No. 1, which plaintiff alleges is not a lawfully issued regulation or order authorized by the Emergency Relief Control Act and was not published in the Federal Register. Announcement No. 1 was followed by a letter dated April 29, 1947, which announcement and letter RFC has attempted to enforce, and pursuant to which RFC has refused to pay to plaintiff the livestock slaughter payments due to it. Announcement No. 1 advised all slaughterers, including Swift, that subsidies allocable to meat and meat products which they had in their inventories at the close of business on October 14, 1946, would not be paid, and that if such subsidies had already been paid on such inventories they would be recaptured by RFC, in order to avoid unjust enrichment of packers at the expense of the Government. That in accordance with this Announcement RFC notified Swift by letter dated April 29, 1947, that Swift was required to complete RFC's enclosed form designated as form DSC-118, intended to provide for recapture of meat subsidies paid on meat and meat products in inventory at the close of business on October 14, 1946. Said letter advised Swift that on completion of form DSC-118, the amount due to RFC for recapture would appear as Schedule 6 of the form, and that the sum of money so indicated was to be paid to RFC by Swift with the filing of the form. The letter further stated that in cases "not settled pursuant to the procedures provided herein, they will be referred to the Department of Justice."

Plaintiff complains that this conduct on the part of RFC is in violation of the provisions of Section 2(m) of the Emergency Price Control Act, as well as in violation of plaintiff's rights under the Fifth Amendment to the Constitution of the United States. In its prayer for relief Swift demands that this court enter a declaratory judgment declaring Announcement No. 1 to be invalid and of no force and effect; that this court issue a temporary restraining order enjoining defendant from en-

forcing and carrying out the provisions of Announcement No. 1; and that it direct RFC to pay to Swift the balance of $221,-861.51, which it claims is still due and owing to it.

In its answer Reconstruction Finance admits that Swift has filed claims for subsidies under Regulation No. 10 for the accounting periods of September and October, 1946, in the amounts and at the times alleged in the complaint; admits that Reconstruction Finance has paid on these claims the sum of $1,304,583.51, but denies the validity of Swift's subsidy claims for the accounting periods of September and October, 1946. In addition, the Reconstruction Finance in its answer states that this court does not have jurisdiction to entertain this action. This lack of jurisdiction is based upon three factors: (1) That meat and meat products are not "agricultural commodities" within the meaning of Section 2(m); (2) That Swift is attacking the validity of a lawfully issued regulation of Reconstruction Finance, and by the provisions of Section 204(4) of the Emergency Price Control Act of 1942, as amended, its validity can be determined in the first instance only by the United States Emergency Court of Appeals; and (3) That Swift has not exhausted the administrative procedures and remedies provided for by the Emergency Price Control Act. Reconstruction Finance also sets up two counterclaims in the total amount of $26,528.42 against Swift alleged to have arisen out of meat subsidies and butter subsidies paid to Swift, for accounting periods other than September and October 1946, but which it was not entitled to receive and retain.

It is also agreed that complaints have been filed by Armour and Cudahy which contain allegations basically similar to those in the Swift complaint, and to which Reconstruction Finance has pleaded the same defenses as in the Swift complaint.

There appear to be two fundamental issues involved in this action, apart from any consideration of the counterclaims. One issue relates to the merits of the subsidy claims presented by plaintiff, and the other relates to the jurisdiction of this court. Determination of the jurisdictional question requires consideration of the same facts, statutes and administrative action as does consideration of the merits of plaintiff's subsidy claims. Only law questions are presented by the pleadings, there being no dispute as to any essential issue of fact.

Plaintiff relies upon Section 2(m) of the Emergency Price Control Act of 1942, as amended and extended, 50 U.S.C.A.Appendix, § 902(m), to give this court jurisdiction of the action set up in its complaint. That Section which was added to the Emergency Price Control Act in June, 1944, provides:

"No agency, department, officer, or employee of the Government, in the payment of sums authorized by this or other Acts of Congress relating to the production or sale of agricultural commodities, or in contracts for the purchase of any such commodities by the Government or any department or agency thereof, or in any allocation of materials or facilities, or in fixing quotas for the production or sale of any such commodities, shall impose any conditions or penalties not authorized by the provisions of the Act or Acts, or lawful regulations issued thereunder, under which such sums are authorized, such contracts are made, materials and facilities allocated, or quotas for the production or sale of any such commodities are imposed. Any person aggrieved by any action of any agency, department, officer, or employee of the Government contrary to the provisions hereof, or by the failure to act of any such agency, department, officer, or employee may petition the district court of the district in which he resides or has his place of business for an order or a declaratory judgment to determine whether any such action or failure to act is in conformity with the provisions hereof and otherwise lawful; and the court shall have jurisdiction to grant appropriate relief. The provisions of the Judicial Code as to monetary amount involved necessary to give jurisdiction to a district court shall not be applicable in any such case."

Swift urges that it has a right to recover unpaid livestock slaughter subsidies (and to retain the subsidy payments previously made to it by RFC) with respect to

carcasses and processed meats on hand in its inventories upon termination of price control on October 15, 1946, resulting from animals slaughtered in reliance upon the livestock slaughter subsidy program in effect under the Emergency Price Control Act, and appropriate regulations, during the period of September 1, 1946, to October 15, 1946.

On the other hand RFC contends that it was a fundamental conception of the subsidy program from its inception that meat subsidies would be paid only upon such meat and meat products as were sold by the slaughterers at controlled prices, and that all slaughterers knew of this condition and had notice thereof. That Announcement No. 1 and the implementing letter merely restated the condition and announced the procedure to be followed by the slaughterers in computing their terminal inventories and the procedure by RFC in recovering such sums as might have been erroneously paid on such inventories. That the Announcement was not intended to and did not in fact change any existing substantive rights or liabilities.

The subsidy program rested basically on the authority of Section 2(e) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix § 902(e). The Stabilization Act of 1942, 50 U.S.C.A.Appendix, § 961 et seq., complemented the Emergency Price Control Act and vested the President of the United States with various powers in respect of prices and wages. Pursuant to both Acts, the President promulgated Executive Order No. 9250, 50 U.S.C.A.Appendix, § 901 note (7 Fed.Reg. 7871) which established the Office of Economic Stabilization, and authorized that office to direct the Reconstruction Finance Corporation and subsidiaries organized pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, 15 U.S.C.A. § 606b, to use their authority to subsidize any commodity if such measure, among others provided for in the order, was deemed necessary to insure the maximum necessary production and distribution of the commodity in question, or to maintain selling prices, or to prevent price rises inconsistent with the purposes of the Executive Order.

Defense Supplies Corporation, a subsidiary of RFC, was designated as the paying or disbursing agency in respect of livestock slaughter subsidies. The necessary appropriations appear to have been made by Congress from time to time, as provided and authorized by Section 2(e) of the Price Control Act. Through its subsidiary, Defense Supplies Corporation, RFC participated in the livestock subsidy program from its inception, subject to the operating directives and control of the Office of Economic Stabilization. By order and directive of the Office of Economic Stabilization effective January 28, 1946, (11 Fed.Reg. 1215), RFC replaced its subsidiary Defense Supplies Corporation, as the paying and disbursing agent, and continued thereafter to serve as such agent, the statutory powers of Defense Supplies Corporation having been terminated by an Act of Congress.

Under the Emergency Price Control Act the Director of Economic Stabilization was authorized to issue operating directives, and accordingly in such an operating directive he laid down the basic standards with which RFC was to comply in making livestock slaughter subsidy payments. On October 26, 1943, the Director of Economic Stabilization announced a stabilization program establishing a maximum and minimum range of prices at which producers must sell and slaughterers must buy livestock, the directive providing:

"(a) That the livestock slaughter payments made with respect to cattle under Regulation 3 of Defense Supplies Corporation inure to the benefit of cattle producers; (b) That such payments are made only to the extent necessary to maintain live cattle prices within a range consistent with the purposes of the stabilization and production programs; (c) That such prices do not impose undue hardships upon any group of slaughterers whose output is needed to obtain the maximum necessary production; and (d) That the available supplies of live cattle are equitably distributed among slaughterers and feeders."

The operating directive then proceeds to set forth the prices at which producers

were required to sell and slaughterers were required to purchase live cattle, and further provided that if a slaughterer paid either above or below this range of prices his subsidy would be adjusted accordingly, and then concludes with this statement:

"9. This directive shall become effective immediately except that paragraphs 3 and 4 shall become effective on December 1, 1943, and payments under paragraph 5 shall be made with respect to cattle slaughtered on and after November 1, 1943."

The statement of considerations issued simultaneously with the Directive (Office of War Information Release 2652) stated that among the objectives of the directive was:

"2. To maintain prices of live cattle within a stated range approximating the present price levels, thus affording a support price to livestock producers and at the same time discouraging unwarranted advances in the live markets."

The statement then continued:

"Since May, 1942, beef prices have been subject to control at wholesale and retail. On December 16, 1942, uniform dollars and cents prices were established by zones throughout the country for beef carcasses and wholesale cuts. Based upon these regionally uniform wholesale prices, uniform dollars and cents retail prices were established in May, 1943. As part of the Government's program for reducing the cost of living to the general level of September 15, 1942, the wholesale and retail prices of beef were reduced by approximately 10 per cent in June of 1943. In order that this reduction might not threaten production of live stock by unduly reducing the return to the producer, the price reduction was accompanied by the institution of an equalized payment to slaughterers, enabling them to continue to pay the same prices for live cattle."

And further:

"The directive has a second major purpose: To stabilize the prices of live cattle within a range corresponding approximately to current levels.

"A substantial increase in present live cattle prices would nullify the relief which the directive affords to non-processing slaughterers. It would also threaten the position of the industry as a whole. A decline in live cattle prices on the other hand would defeat the purpose of the general subsidy program by discouraging production, and would be detrimental to the interests of live stock producers.

"The Director has considered the possibility of establishing both price ceilings and support prices for live cattle. The present directive, while avoiding the disadvantages of a formal price regulation or support price program, seeks to accomplish the purposes of both. This it does by requiring deductions from subsidy payments in the case of any slaughterer whose monthly payments for live cattle are either above or below the range of prices provided for in the directive."

It appears that the Directive of October, 1943, initiating the livestock stabilization program, speaks only of payment of subsidy on slaughter of live stock, which payment was intended to inure to the benefit of the producer. The slaughterer was merely the medium through which the benefit of the subsidy eventually reached the producer, the entire program being designed in order not to depress the selling prices of the producer, and so as to maintain his production incentive. The subsidy was to be paid not to the consumer, not to the retailer, not to the wholesaler, not on meat inventories of the slaughterers, but was to be paid to the slaughterer for the killing of the live animal, and from which payment the producer had already secured the benefit at the time the slaughterer purchased the livestock from him. The directive provided that the slaughterer was to be reimbursed when he slaughtered the livestock for which he had passed on to the producer the subsidy benefits, as required by Section 7003.10(b). What the producer received was as much a livestock subsidy as if the Government itself had made the payment directly to the producer.

Attempts to stabilize the selling price of live cattle, as outlined in the October, 1943, release of the Director of Economic Stabilization were deemed inadequate, and by Directive 28 (10 Fed.Reg. 522, issued January 10, 1945) "overriding" ceiling

prices on sales of live cattle and calves were authorized. The subsidy paying agencies were ordered to establish "overriding" ceiling prices on live animals. The maximum and minimum livestock prices established, pursuant to the basic directive of October 26, 1943, were retained with the "overriding" ceiling price operating as a further restriction. The purposes of the directive were described as follows:

"This order is designed to implement the program instituted pursuant to the directive on Livestock Slaughter Payments, issued by the director, Office of Economic Stabilization, October 26, 1943. This order is designed to insure maintenance of prices of live cattle and calves within a range consistent with the purposes of stabilization and production programs and to aid in carrying out the purposes of the directives on livestock slaughter payments of October 26, 1943."

The program as announced in Directive No. 28 revised subsidy payments respecting live cattle "slaughtered on or after January 29, 1945, "and Defense Supplies Corporation was directed to amend its Regulation 3 in accordance with the order. Pursuant to Directive 28 the Office of Price Administration issued MPR 574 which established "overriding" ceiling prices on live animals, and prohibited any producer or any slaughterer from selling or buying livestock at prices in excess of the established price. Directive 41 (10 Fed.Reg. 4494, April 23, 1945,) which followed Directive No. 28, and which revoked all previous directives "so far as they are .inconsistent with this directive and remain in effect in all other particulars," did not condition the payment of subsidies either directly or indirectly on the requirement that the processed commodities must eventually be sold to the consumer during the existence of retail ceiling prices. The directive authorized payment of subsidies on "livestock slaughter" and was "designed to implement the stabilization and production program with respect to cattle." The directive is entitled "Livestock Slaughter Payments," and authorizes payment of subsidies on livestock slaughter, setting forth the rates and grades as follows:

"Defense Supplies Corporation is directed to pay the following rates by grade for cattle slaughtered on or after May 1, 1945."

Directive 41 recited in detail the conditions which RFC was authorized to establish upon the payment of subsidies, and nowhere therein, either by express language or by reference, can I find where RFC was authorized to impose the conditions contained in Announcement No. 1, and the implementing letter, which it now urges was always a part and parcel of the subsidy program, and should have been well known to the industry. On November 18, 1946, (subsequent to October 14, 1946, the date of the termination of price control) Directive 41 was amended for the purpose of clarifying some of the conditions of payment on "livestock slaughter." Thus, even after decontrol, Directive 41 still dealt with the livestock slaughter program for purposes of clarifying conditions applicable to payment of the subsidies, but nowhere imposing any additional conditions or penalties. On March 12, 1947, previous to the issue of Announcement No. 1, and again on April 8, 1947, after issuance of Announcement No. 1, and again on May 2, 1947, after issuance of both Announcement No. 1 and the Implementing letter, Directive 41 was amended, but nowhere in these various amendments is any language used which I am able to interpret as intended to amend the original Subsidy Act so as to provide that it covers a consumer's meat subsidy and not a slaughterer's subsidy for the benefit of the producer. RFC itself apparently interpreted the original Act as providing for a slaughterer's subsidy.

The Emergency Price Control Act of 1942, as amended and extended, terminated on June 30, 1946, by virtue of the President's veto of a bill passed by Congress to extend the Act for another year, which automatically terminated the livestock slaughter subsidy program. Subsidies had been paid upon all livestock slaughtered prior to June 30, 1946, irrespective of whether inventory of processed meats resulting from such slaughtering were on hand or not at the time of the expiration of the Price Control Act.

July 25, 1946, Congress passed the Price Control Extension Act of 1946, 50 U.S.C.A. Appendix § 901 et seq. Section 6 thereof, 15 U.S.C.A. § 713 note, extending the authority of Reconstruction Finance Corporation to continue the noncrop subsidy program theretofore in effect for the period ending June 30, 1947.

August 28, 1946, RFC issued its regulation No. 10 entitled "Livestock Slaughter Payments Regulation No. 10, Reconstruction Finance Corporation" re-establishing the livestock slaughter subsidy program which was in effect on June 30, 1946. This Regulation consisted of three sections, the first of which provided that "Reconstruction Finance Corporation shall make payments to eligible slaughterers on cattle, calves, hogs, and pigs slaughtered on and after September 1, 1946, in accordance with all the terms and conditions of Livestock Slaughter Payments, Revised Regulation No. 3 of Reconstruction Finance Corporation as amended * * *." The second section provided that Revised Regulation 3, and specified amendments thereto were incorporated into and made a part of Regulation 10. The third section took cognizance of the prospective termination of the regulation in contemplation of the policy of gradual decontrol provided for in the Extension Act of 1946. Express reference was made to the termination section of Revised Regulation No. 3 and that section was amended by the addition thereto of the further provision that "This regulation shall terminate automatically without regard to the ten-day notice provision of Section 7003.12 of Revised Regulation No. 3, on the failure of any condition required by law as a prerequisite to validity of a subsidy on livestock or meat."

With this exception, the termination section of Revised Regulation No. 3 was continued in force, including in particular the provision that termination of the regulation "shall not preclude the filing of claims on account of livestock slaughtered on or before the date of termination for which the applicant would otherwise have been eligible."·

Effective October 15, 1946 price controls on livestock and products processed therefrom were removed by order of the Office of Price Administration. On January 3, 1947, PFC confirmed the termination of the livestock slaughter subsidy program and of Regulation No. 10 as of midnight October 14, 1946, by publication in the Federal Register of a declaration to that effect (12 Fed.Reg. 66) the notice reciting that "Part 7010—Livestock Slaughter Payments, expired October 14, 1946."

On March 31, 1947, RFC issued what it termed Announcement No. 1 advising all slaughterers that subsidies allocable to meat and meat products which they had in their inventories at the close of business on October 14, 1946, would not be paid, and that if such subsidies had been paid on such inventories then RFC would proceed to recapture such payments. Announcement No. 1 was followed on April 29, 1947 by the implementing letter.

 RFC now insists that under Regulation No. 10 the subsidy here under consideration is and always has been a consumer's meat subsidy and therefore should not have been paid to the slaughterers unless the meats processed from livestock were sold to the consumer during the existence of retail ceiling prices.

With this I do not agree. I can find no such provision, either directly or by inference, in Regulation No. 10. Both Regulations 3 and 10 provided expressly that the subsidy was payable at the time of the slaughter of the livestock. The Emergency Court of Appeals so held in Armour & Company v. Reconstruction Finance Corporation, Em.App., 162 F.2d 918, 922, saying:

"We have heretofore held that the livestock slaughter subsidy was basically a production subsidy and as such was authorized by Section 2(e) of the Act."

I believe that the entire livestock slaughter subsidy program was expressly designed to operate for the benefit of the livestock producer. I believe that RFC itself so interpreted the original Act and the Extension Act of 1946, because it honored subsidy claims for slaughter up to June 30, 1946, and paid claims for actual slaughter occurring after September 1, 1946, and up to October 15, 1946. RFC makes no claim that at the termination of Regulation No. 10 on October 14, 1946,

plaintiff had not fully complied with all subsidy and price regulations. I am of the opinion that the interpretation of Regulation No. 10 now urged by RFC is repugnant to the clear and unambiguous language used in Regulation No. 10. Nowhere in the Regulation can I find anything contrary to the express language which provides that the subsidy became due and was payable at the time the slaughtering took place. The producer had previously secured the benefit of the subsidy because it was included in the higher price which he had received for the sale of his livestock. The subsidy was made payable at the slaughtering level for administrative purposes only, the benefit thereof accruing to the producer because the controlled prices at which he could sell his livestock took the subsidy into consideration. The courts have frequently held that the meaning of a statute must in the first instance be sought in the language in which the Act is framed, and if that is plain, and if the law is within the constitutional authority of the law making body which passed it, the whole function of the courts is to enforce it according to its terms. Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas.1917B, 1168. I therefore hold that under the plain and unambiguous meaning of Regulation No. 10 the subsidy payments here in controversy became due at the time the slaughtering took place, and plaintiff is therefore entitled to be paid the sum of $221,861.51, as set out in its complaint.

■ Defendant attacks the jurisdiction of this court on the ground that Section 204(d) of the Price Control Act withdrew from all courts, including this court, and vested in the Emergency Court of Appeals, jurisdictional power "to determine the validity of any regulation or order issued under Section 2." Section 204(d) of the Emergency Price Control Act provides:

"The Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have exclusive jurisdiction to determine the validity of any regulation or order issued under section 2, of any price schedule effective in accordance with the provisions of section 206, and of

any provision of any such regulation, order, or price schedule. Except as provided in this section, no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this Act authorizing the issuance of such regulations or orders, or making effective any such price schedule, or any provision of any such regulation, order, or price schedule, or to restrain or enjoin the enforcement of any such provision."

Section 204(d) gives to the Emergency Court of Appeals exclusive jurisdiction to determine the validity of any regulation or order issued under Section 2 of the Act, and that is just what plaintiff complains of. It insists that Announcement No. 1 was not a regulation or order authorized by Section 2(e) but on the contrary amounts to a condition or penalty not authorized by the provisions of the Act, and therefore brings its cause of action squarely within the jurisdiction of this court, with which contention I agree. The Government admits that the remedy provided by Section 2(m) can be invoked in this case only by persons claiming subsidies "relating to the production or sale of agricultural commodities," but the Government denies that subsidies here involved do so "relate to the production or sale of agricultural commodities." Holding, as I do, that the subsidy here in question is one for the benefit of the producer, and that at all times the benefits of the subsidy were passed on by the slaughterer to the producer, it necessarily follows that it is one "relating to the production or sale of agricultural commodities." In Atlantic Meat Company, Inc. v. Reconstruction Finance Corporation, 166 F.2d 51, 54, decided on February 5, 1948, by the Circuit Court of Appeals for the First Circuit, that court held that Section 2(m) gave District Courts jurisdiction to grant relief where the plaintiff complained of "unlawful conditions or penalties imposed in the payment of sums relating to the production or sale of agricultural commodities." In that case, however, the court was confronted with the additional duty of interpreting "agricultural commodities" in

**554**

contradistinction to "[commodities] manufactured or processed in whole or substantial part from an agricultural commodity." This question does not arise in the instant case, because of my holding that the subsidies here involved relate to the production of agricultural commodities.

I am of the opinion that Announcement No. 1, together with its implementing letter, amounts to a penalty and is not a regulation or order authorized by Section 2(m), and that therefore this court has jurisdiction to entertain the case at bar, the remedy sought being one expressly "relating to the production or sale of agricultural commodities."

Plaintiff is entitled to a declaratory judgment finding that RFC is indebted to it in the sum of $221,861.51, the amount claimed in the complaint.

The Reconstruction Finance Corporation in its answer sets out two counterclaims, which have not been considered by the court in this opinion.